[Cite as *State v. Schlee*, 2014-Ohio-5765.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-L-131** |
| LARRY M. SCHLEE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 92 CR 000517.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen A. Sheppert*, Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Larry M. Schlee,* pro se, PID: A273258, Allen/Oakwood Correctional Institution, P.O. Box 4501, Lima, OH 45802 (Defendant-Appellant).

COLLEEN MARY O'TOOLE, J.

{¶1} Larry M. Schlee appeals from the judgment entry of the Lake County Court of Common Pleas, denying, without hearing, his motion for leave to file a motion for new trial pursuant to Crim.R. 33. Mr. Schlee contends that two affidavits filed in conjunction with his motion establish he is entitled to a new trial based on new evidence, Crim.R. 33(A)(6). We disagree, and affirm the judgment of the trial court

{¶2} This matter has a lengthy and tortured history. Mr. Schlee was originally convicted in 1993 of the 1980 aggravated murder of Frank Carroll, and sentenced to life imprisonment with possibility of parole after 20 years. *State v. Schlee*, 11th Dist. Case No. 2004-L-070, 2005-Ohio-5117, ¶1-2 ("*Schlee* II"). This court affirmed. *Id.* at ¶3. In July 2002, Mr. Schlee moved for a new trial based on new evidence and prosecutorial misconduct, which motion the trial court granted. *Id.* at ¶4. The state moved this court for leave to appeal this decision, which motion was denied. *Id.* Trial commenced March 8, 2004; and on March 19, 2004, the jury again returned a guilty verdict. *Id.* at ¶5. Mr. Schlee was sentenced to life imprisonment with possibility of parole after 15 years. *Id.* Mr. Schlee again moved for a new trial, which motion the trial court denied. *Id.* at ¶6. The appeal resulting in *Schlee* II ensued. *Id.* at ¶7. This court affirmed the judgment of the trial court, denying the motion for new trial. *Id.* at ¶93.

{¶3} There have been numerous related proceedings, including motions for postconviction relief. Apart from the denial of the state's motion opposing the trial court's decision to grant a second trial, and a motion to certify a legal issue raised, this court has consistently denied Mr. Schlee the relief he seeks, and the Supreme Court of Ohio has consistently declined jurisdiction.

{¶4} The present appeal arises from the filing of a motion for leave to move for new trial based on new evidence and prosecutorial misconduct August 22, 2013. The state opposed the motion November 1, 2013; and Mr. Schlee replied November 15, 2013. The trial court denied the motion for leave November 26, 2013, and this appeal timely ensued, Mr. Schlee assigning a single error: "The trial court erred and/or abused

2

its discretion in denying defendant-appellant leave to file a motion for new trial." The issue presented is:

{¶5} "Did the trial court err and/or abuse its discretion when it denied Defendant-Appellant leave where Appellant provided clear and convincing evidence that he was unavoidably prevented from obtaining the new evidence within 120 days after the jury returned its verdict, where the newly discovered evidence is exculpatory in nature, where the trial court failed to provide any reasons or rationale it used to base its conclusion on, and where the trial court improperly conflated two distinct issues when making its decision?"[1]

{¶6} Essentially, Mr. Schlee relies on a 2010 affidavit from Mr. John Turchik, a witness at the 2004 trial, stating he gave a mistaken date and details for a vital conversation relating to Mr. Schlee's guilt; and a 2013 affidavit of Nancy Robison, the investigator for Mr. Schlee's defense team, stating that Mr. Turchik's allegedly exculpatory evidence was known to the state in 2004, but never turned over to the defense.

{¶7} "Crim.R. 33(A) provides that '(a) new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: (6) when new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial. (* * *) The defendant must produce at the hearing (* * *) the affidavits of the witnesses by whom such evidence is expected to be given(.)'

---

1. After the state filed its brief, Mr. Schlee moved this court to file a traverse. A traverse is, "A formal denial of a factual allegation made in the opposing party's pleading * * *." *Black's Law Dictionary* 1218 (7th Ed.2000). It is a common law pleading, *id.*, long abolished in Ohio. We grant leave to file the traverse, considering it in the nature of a reply brief, and have considered it in rendering judgment.

{¶8} "A new trial is allowed where the new evidence: "'(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.'" *State v. Hawkins* (1993), 66 Ohio St.3d 339, 350, * * *, quoting *State v. Petro* (1947), 148 Ohio St. 505, * * *, syllabus. The trial court has discretion to grant or deny a motion for a new trial for newly discovered evidence, and absent an abuse of discretion, that decision will not be disturbed. *Hawkins, supra*, at 350, citing *State v. Williams* (1975), 43 Ohio St. 2d 88, * * *, paragraph two of the syllabus." (Parallel citations omitted.) *State v. Rock*, 11th Dist. Lake No. 2005-L-005, 2005-Ohio-6291, ¶23-24.

{¶9} The term "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record. *State v. Ferranto*, 112 Ohio St. 667, 676-678 (1925). An abuse of discretion may be found when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶15 (8th Dist.)

{¶10} The following facts are taken from this court's opinion in *Schlee* II, ¶9-20.

{¶11} "Appellant first met the decedent while the two were in high school in 1966. Over the years, the two developed a close friendship. In 1977 or 1978, Carroll introduced appellant to Amy Binns Woodsby ('Woodsby'). Carroll and Woodsby were dating each other at that time. However, by June 1979, Woodsby had become

4

intimately involved with appellant, and the friendship between appellant and Carroll deteriorated.

{¶12} "In the early morning hours of June 3, 1979, appellant's car was set on fire while he and Woodsby were at his home. Appellant and Woodsby conveyed to the police that they believed Carroll had set the blaze. Later that morning, Carroll appeared at appellant's home and began to assault Woodsby. Appellant broke up the fight. Carroll went to his car and returned with a rifle which he fired at appellant and Woodsby. Appellant returned fire striking Carroll in the chin. As a result of this incident, Carroll was charged with felonious assault, but appellant was not indicted as his actions were deemed to be 'self defense.' Carroll's pretrial was scheduled for February 5, 1980.

{¶13} "Woodsby testified that on February 2, 1980, appellant asked her to accompany him to a park to meet with Carroll. Woodsby testified that prior to this date, appellant had expressed concern that Carroll would report appellant's drug dealing activities to the authorities in retaliation for proceeding with the felonious assault charge. The meeting was allegedly for appellant and Carroll to resolve their differences and perhaps make a deal whereby appellant would dismiss the felonious assault charge if Carroll would refrain from reporting appellant's drug trafficking to the authorities. After the alleged meeting occurred, no one ever saw Carroll alive again.

{¶14} "According to Woodsby, at appellant's direction, she hid under a blanket in the back seat when they went to meet Carroll. They arrived at the designated meeting place first and had to wait a few minutes for Carroll to arrive. After Carroll arrived, Woodsby heard the two men talking and she testified that she thought they were working out their differences. Then she heard shots being fired from a gun. Her

testimony was inconsistent as to whether she actually saw appellant fire his last shot at Carroll, or whether she stayed under the blanket and just heard the gun shots. In either case, she testified that appellant told her not to tell anyone about what had happened or that she would end up 'just as dead as Frank.'

{¶15} "Woodsby stated that she saw appellant take a wallet and keys from Carroll's pockets, and he proceeded to first wrap the body in plastic, then into a sleeping bag, before sealing these wrappings with duct tape. She then helped appellant put the body in the trunk of appellant's car.

{¶16} "Appellant and Woodsby then drove Carroll's car and appellant's car to Cleveland Hopkins Airport where they parked Carroll's car on the top level of the parking deck. Appellant put Carroll's wallet in the glove compartment, locked the doors, and took the keys with him. According to Woodsby, appellant wanted to make it look like Carroll had fled prosecution of the felonious assault charge.

{¶17} "Woodsby testified that they drove east on Interstates 2 and 90 towards Pennsylvania to dispose of the body. She stated that they dumped the body in a wooded area, and then returned to Ohio disposing of pieces of the murder weapon along the way.

{¶18} "The prosecution submitted appellant's 1993 trial testimony in its case in chief. In the first trial, appellant testified that he spent the weekend of February 2, 1980, at his grandmother's house in Lake County.

{¶19} "At some point shortly after the crime, Woodsby told her boss, John Turchik ('Turchik'), about the murder. There is a dispute in the present proceeding as to whether that conversation took place on February 4, 1980 or two weeks later, on

February 18 or 19, 1980, although the trial testimony in the second proceeding was consistent that this conversation occurred on February 4, 1980.

{¶20} "During the summer of 1980, nearly seven months after Carroll had last been seen, his car was discovered parked in the airport garage, exactly where Woodsby testified that appellant had parked it. Found in the glove compartment were the deceased's wallet and checkbook with a date of February 2, 1980 as the last entry in the register.

{¶21} "In the fall of 1980, Woodsby and appellant moved to Arizona where they lived together, off and on, until early 1983. After the two parted company, Woodsby, in April of 1983, wrote a letter describing the murder. She gave the narrative to her lawyer in case anything happened to her. Finally, in 1992, Woodsby contacted the Mentor, Ohio police department to report the murder of Carroll.

{¶22} "Based upon the allegations made by Woodsby in 1992, a Lake County Sheriff's Deputy traveled to Westfield, New York, in order to inspect an unidentified skeleton, which had been discovered in October of 1981. The body was wrapped in materials similar to those described by Woodsby. There were some personal effects on the body, which were later identified by Carroll's daughter as belonging to her father. The deputy testified that the route he took from Painesville to where the body was found in New York was very similar to the path described by Woodsby. The identity of the body was also confirmed from dental records."

{¶23} Like the sole assignment of error in this case, the third assignment of error in *Schlee* II dealt with the trial court's denial of a motion for new trial based on new

evidence. *Id.* at ¶24. The affidavits presented in *Schlee* II are similar to those presented in this case. In *Schlee* II, this court held, at ¶65-77:

**{¶24}** "In the third assignment of error, appellant asserts that the trial court abused its discretion by denying his request for a new trial. Specifically, appellant claims that the affidavits of Turchik, Jeff Elersic ('Elersic'), and trial counsel, Charles Grieshammer ('Grieshammer'), constituted newly discovered evidence pursuant to Crim.R. 33(A)(6), and that he was surprised by some of the new evidence under Crim.R. 33(A)(3).

**{¶25}** "At trial, Woodsby's boss, Turchik, testified that she told him about the murder after returning to work from a weekend in early February 1980. Turchik understood that the murder had occurred during that past weekend, which would have been consistent with Woodsby's testimony that the murder occurred on February 2, 1980. That date was also consistent with the fact that nobody saw Carroll alive after February 2, 1980.

**{¶26}** "In support of his motion for a new trial, appellant provided the trial court with an affidavit from Turchik. In that affidavit, Turchik stated that after thinking about his testimony further, and speaking with another coworker named 'Reno,' he then recalled that his conversation with Woodsby did not occur until February 18th or 19th of 1980, or, approximately two weeks later than he had claimed at trial.

**{¶27}** "Appellant also provided an affidavit from Elersic. In his affidavit, Elersic stated that sometime in the middle of February 1980, Woodsby inquired of him if he 'knew of anyone who would kill' the victim.

8

**{¶28}** "It is appellant's contention that the two-week discrepancy is vital to his defense. He offers the theory that Carroll may have fled the area on February 2, 1980 so as to avoid prosecution of the pending felonious assault charge. Then, in mid-February, Woodsby took a trip to Florida with the thought of hiring a 'hit-man' to kill Carroll, who had been causing Woodsby trouble. The murder was then committed on the weekend of February 16, 1980 by a paid assassin. That would explain why it was not until February 18th or 19th that Woodsby told Turchik of the murder. Appellant asserts that under this alternative theory of the murder, he would be exonerated of the crime.

**{¶29}** "In the affidavit from trial counsel, Grieshammer, he stated that he talked to Turchik *prior to trial* and that the closest estimate Turchik could give him as to the date of the conversation with Woodsby was late February or early March of 1980. Thus, Grieshammer was surprised when, at trial, Turchik testified that the conversation occurred on February 4, 1980, and that the crime had just occurred during the preceding weekend.

**{¶30}** "* * *

**{¶31}** "* * *

**{¶32}** "In the case at bar, appellant argues that the affidavit of Turchik, in which he changed his mind as to the date of his conversation with Woodsby, was not known until after the trial and, thus, was newly discovered evidence. The record does not support this claim.

**{¶33}** "According to Turchik's affidavit, he told Nancy Robison, an investigator for the Lake County Public Defender's Office, *prior to trial*, that he 'believed' the

9

conversation occurred in late February or early March of 1980. Grieshammer also admitted that he spoke to Turchik prior to trial and was told that 'to the best of (Turchik's) recollection the conversation between he and (Woodsby) that he testified to in the trial happened in late February, 1980.'

{¶34} "Thus, it is clear that appellant's counsel knew prior to trial that there was some doubt in Turchik's mind as to exactly when the conversation occurred. Turchik never indicated to anyone that he was quite certain that the conversation took place in late February or early March of 1980. Hence, it is difficult to accept that appellant was truly surprised by Turchik's testimony at trial. Further, it is clear that counsel had this information if not *prior* to trial, at least during trial - so it was not evidence that was newly discovered after trial. Finally, under the sixth prong of the *Petro* test, it is apparent that this 'new' evidence was nothing more than a contradiction of the 'former' evidence and, therefore, did not warrant the granting of a new trial.

{¶35} "As for the affidavit from Elersic, it is undisputed that appellant's trial counsel knew of this witness, and what he had to add to the evidence, as of the second or third day of the trial. This was clearly before the defense even began to present its case to the jury.

{¶36} "Therefore, this also did not qualify as newly discovered evidence since it existed during the course of the trial. Appellant asserts that while he knew of Elersic, he was not aware of the time frame when Elersic spoke to Woodsby until Elersic testified at trial. There is no evidence in the record, however, that Elersic was attempting to hide the date of his conversation. This appears to be a case where nobody bothered to try and pin him down as to when that conversation occurred. If due diligence had been

10

exercised, that information could have been obtained prior to trial. Under these circumstances, this court must conclude that this was not newly discovered evidence." (Emphasis sic.)

{¶37} A similar analysis applies to the affidavits of Mr. Turchik and Ms. Robison in this case. Mr. Turchik's is largely an elaboration of the affidavit submitted in *Schlee* II, detailing exactly why he now believes his conversation with Ms. Woodsby about the murder occurred on or about February 18 or 19, 1980, following her return from Florida. But the issue regarding the dates of the conversation is the same, and Mr. Turchik's belief that the conversation had occurred after February 4, 1980 – the date he testified to at trial – was known to the defense at the time of trial in *Schlee* II. *Id.* at ¶74-75. The only information in the present affidavit which might be viewed as "new" is Mr. Turchik's assertion Ms. Woodsby told him Mr. Schlee had no intention of killing Mr. Carroll, which would negate the "prior calculation and design" element necessary for aggravated murder. R.C. 2903.01(A). But the defense team in 2004 spoke with Mr. Turchik prior to trial, and had the opportunity to cross examine him at trial. It could and should have elicited this information from him then.

{¶38} In her affidavit, Ms. Robison emphasizes the state knew Mr. Turchik thought the conversation with Ms. Woodsby occurred later than the date he testified to at trial, and that Mr. Turchik told the state of Ms. Woodsby's assertion Mr. Schlee had no intention to kill Mr. Carroll – but that the state never informed the defense of this information. We respectfully find this insufficiently "new" evidence to warrant the grant of a new trial. The defense team had access to Mr. Turchik prior to the 2004 trial; his own affidavit establishes he spoke with the defense team on several occasions; the

11

defense had the opportunity to cross examine him at trial. Failure to elicit this information at the time does not make it newly discovered.

**{¶39}** Mr. Schlee cannot meet the 6th requirement of the *Petro* test necessary for granting of a new trial: the affidavits submitted in support of the instant case are not new evidence, but merely impeach or contradict former evidence.

**{¶40}** Mr. Schlee relies heavily on two cases: *State v. Walden*, 19 Ohio App.3d 141 (10th Dist.1984); and *State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181 (2nd Dist.) Both are distinguishable. His motion was based on purportedly newly discovered evidence that Mr. Carroll's death occurred February 16, 1980, rather than February 2, 1980; that Mr. Carroll pulled a gun and fired first at him; and that he had no intention or plan to shoot Mr. Carroll. Allegedly, Mr. Turchik learned this information from Ms. Woodsby in 1980 and reported it to the prosecution prior to the retrial in 2004. Mr. Schlee maintains the prosecution did not disclose this evidence, but rather, that defense investigator Nancy Robison, learned of it from Mr. Turchik during a conversation in 2010.

**{¶41}** Schlee cites to *Walden*, *supra*, as an example of the prosecution withholding exculpatory evidence as a basis for granting leave to file a motion for new trial. According to him, "[i]n the present case, as in *Walden*, the new evidence would have provided the necessary support to prove by a preponderance of the evidence that [Schlee] acted in self-defense." Appellant's brief at 9.

**{¶42}** As an initial matter, if it is Mr. Schlee's contention that he acted in self-defense, it is a tacit admission that he caused Mr. Carroll's death. As a consequence, the date of the killing, whether February 2 or 16, is not particularly relevant to Mr.

12

Schlee's guilt or innocence, as it would be if he asserted an alibi-defense. This focus on the lack of intent renders the issue of the date the murder occurred largely irrelevant.

**{¶43}** In *Walden*, it was demonstrated that the prosecution had withheld documentary evidence corroborating the defendant's trial testimony that she had complained to the police about the victim's conduct prior to killing him. The prosecution argued the defendant had lied about the victim harassing her and vandalizing her apartment in order to conceal her criminal intent, despite the existence of police reports where the defendant complained of telephone harassment. *Id.* at 147-148.

**{¶44}** There are significant factual and procedural differences between *Walden* and the present case. As stated by the *Walden* court, and repeated by subsequent courts including this one, "a party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *Id.* at 145-146. The theory that Mr. Schlee's killing of Mr. Carroll was justified self-defense would have been known to Mr. Schlee from the moment of the actual killing. It cannot be described as a theory of which he had no knowledge. Accordingly, it does not properly constitute newly discovered evidence under Criminal Rule 33(A)(6).

**{¶45}** In *Walden*, the court did not construe the intentional concealment of written police reports as newly discovered evidence but, rather, evidence of prosecutorial misconduct under Criminal Rule 33(A)(2). The defendant in *Walden* could not have learned that the prosecution failed to disclose the police reports.

13

{¶46} In the present case, Mr. Schlee was aware that Mr. Turchik and Ms. Woodsby were witnesses against him – Ms. Woodsby as a witness of the actual killing and Mr. Turchik as someone to whom she confided about the killing. Through the exercise of reasonable diligence, Mr. Schlee could have investigated a self-defense theory based on either witness' testimony prior to his 2004 trial. That he failed to do so is hardly surprising. In his 1993 trial, he testified and denied meeting with Mr. Carroll at the time of the murder, testimony which is wholly inconsistent with a theory of self-defense. *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *9-10 (Dec. 23, 1994) ("*Schlee* I"). In the 2004 trial, Mr. Schlee did not testify or advance any theory of self-defense. In his motion for new trial filed within days of the verdict, he raised the issue of Mr. Turchik's testimony regarding the date of the murder. In that appeal, Mr. Schlee advanced the theory, again inconsistent with self-defense, that Ms. Woodsby had hired an assassin to kill Mr. Carroll. *Schlee* II at ¶69.

{¶47} Mr. Schlee also relies on *McConnell*, *supra*, as an example of a case where the court of appeals held that a hearing on a motion for new trial should have been held based on a witness recanting her trial testimony. In *McConnell*, the defendant was convicted of raping his minor daughter. In finding the evidence could not have been discovered with reasonable diligence, the court in *McConnell* relied on factors not present in this case. The court was hesitant "to embrace a rule that would require a father convicted of raping his eight-year-old child to pursue the victim to obtain a recantation of her trial testimony." *Id.* at ¶15. The recantation was reported by the victim's mother who "had no actual knowledge as to whether the child's sexual abuse allegations at trial were true." *Id.* In the present case, Mr. Turchik's knowledge of what

14

he claimed Ms. Woodsby revealed to him was the same in 1993 as it was in 2004 as it was in 2010. Thus, the *McConnell* decision does not support the conclusion that, with reasonable diligence, Mr. Schlee could not have discovered evidence from either Mr. Turchik or Ms. Woodsby to support a claim of self-defense.

**{¶48}** The trial court did not abuse its discretion in denying leave to move for a new trial. The judgment of the Lake County Court of Common Pleas is affirmed.

THOMAS R. WRIGHT. J., concurs,

DIANE V. GRENDELL, J., concurs with a Concurring Opinion.

_____

DIANE V. GRENDELL, J., concurs, with a Concurring Opinion.

**{¶49}** I concur in the judgment of this court to affirm the denial of Schlee's Motion for Leave to File a Motion for New Trial. I write separately to discuss and distinguish certain cases relied upon by Schlee in support of the Motion.

**{¶50}** Schlee's Motion was based on purportedly newly discovered evidence that Frank Carroll's death occurred on February 16, 1980, rather than February 2, 1980; Carroll pulled a gun and fired first at Schlee; and Schlee had no intention or plan to shoot Carroll. Allegedly, John Turchik learned this information from Amy Binns nka Woodsby in 1980 and reported it to the prosecution prior to Schlee's retrial in 2004. Schlee maintains the prosecution did not disclose this evidence to him. Rather, defense investigator, Nancy Robison, learned of it from Turchik during a conversation in 2010.

15

{¶51} Schlee cites the case of *State v. Walden*, 19 Ohio App.3d 141, 483 N.E.2d 859 (10th Dist.1984), as an example of the prosecution withholding exculpatory evidence as a basis for granting leave to file a motion for new trial. According to Schlee, "[i]n the present case, as in *Walden*, the new evidence would have provided the necessary support to prove by a preponderance of the evidence that [Schlee] acted in self-defense." Appellant's brief at 9.

{¶52} As an initial matter, if it is Schlee's contention that he acted in self-defense, it is a tacit admission that he caused Carroll's death. As a consequence, the date of the killing, whether February 2 or 16, is not particularly relevant to Schlee's guilt or innocence, as it would be if Schlee asserted an alibi-defense. I fully concur in the majority's position that the issue regarding the date of the killing was known to Schlee prior to the 2004 trial and, therefore, does not constitute newly discovered evidence. I wish to emphasize that Schlee's focus on the lack of intent renders the issue of the date the murder occurred largely irrelevant.

{¶53} In *Walden*, it was demonstrated that the prosecution had withheld documentary evidence corroborating the defendant's trial testimony that she had complained to the police about the victim's conduct prior to killing him. The prosecution argued that the defendant had lied about the victim harassing her and vandalizing her apartment in order to conceal her criminal intent, despite the existence of police reports where the defendant complained of telephone harassment. *Id.* at 147-148.

{¶54} There are significant factual and procedural differences between *Walden* and the present case. As stated by the *Walden* court, and repeated by subsequent courts including this one, "a party is unavoidably prevented from filing a motion for new

16

trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *Id.* at 145-146. The theory that Schlee's killing of Carroll was justified self-defense would have been known to Schlee from the moment of the actual killing. It cannot be described as a theory of which Schlee had no knowledge. Accordingly, it does not properly constitute newly discovered evidence under Criminal Rule 33(A)(6).

**{¶55}** In *Walden*, the court did not construe the intentional concealment of written police reports as newly discovered evidence but, rather, evidence of prosecutorial misconduct under Criminal Rule 33(A)(2). The defendant in *Walden* could not have learned that the prosecution failed to disclose the police reports.

**{¶56}** In the present case, Schlee was aware that Turchik and Woodsby were witnesses against him - Woodsby as a witness of the actual killing and Turchik as someone to whom Woodsby confided about the killing. Through the exercise of reasonable diligence, Schlee could have investigated a self-defense theory based on either witness' testimony prior to his 2004 trial. That Schlee failed to do so is hardly surprising. In his 1993 trial, Schlee testified and denied meeting with Carroll at the time of the murder, testimony which is wholly inconsistent with a theory of self-defense. *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, 9-10 (Dec. 23, 1994). In the 2004 trial, Schlee did not testify or advance any theory of self-defense. In a motion for new trial filed within days of the guilty verdict, Schlee raises the issue of Turchik's testimony regarding the date of the murder. In that appeal, Schlee advanced the theory, again inconsistent with self-defense, that Woodsby had hired an

17

assassin to kill Carroll. *State v. Schlee*, 11th Dist. Lake No. 2004-L-070, 2005-Ohio-5117, ¶ 69.

{**¶57**} Schlee also relies on *State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77 (2nd Dist.), as an example of a case where the court of appeals held that a hearing on a motion for new trial should have been held based on a witness recanting her trial testimony. In *McConnell*, the defendant was convicted of raping his minor daughter. In finding that the evidence could not have been discovered with reasonable diligence, the court in *McConnell* relied on factors not present in Schlee's case. The court was hesitant "to embrace a rule that would require a father convicted of raping his eight-year-old child to pursue the victim to obtain a recantation of her trial testimony." *Id.* at ¶ 15. The recantation was reported by the victim's mother who "had no actual knowledge as to whether the child's sexual abuse allegations at trial were true." *Id.* In the present case, Turchik's knowledge of what he claimed Woodsby revealed to him was the same in 1993 as it was in 2004 as it was in 2010. Thus, the *McConnell* decision does not support the conclusion that, with reasonable diligence, Schlee could not have discovered evidence from Turchik or Woodsby to support a claim of self-defense.

{**¶58**} For these reasons, as well as the reasons stated in the majority opinion, I respectfully concur.